Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms and adopts the Opinion and Award of the Deputy Commissioner.
***********
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties as:
 STIPULATIONS
1. On 27 June 1996 and 20 March 1997, the dates of the alleged injuries by accident giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. On said occasions, the employee-employer relationship existed between plaintiff and defendant-employer.
3. On said occasions, defendant-employer was insured by Crawford and Company Insurance.
4. Plaintiffs average weekly wage is $550.00.
5. Plaintiff contends and defendants deny that on 27 June 1996 and 20 March 1997, plaintiff sustained an injury by accident to her neck, shoulders, lumbar spine, and pelvis, and psychological injuries, arising out of and in the course of her employment.
6. Plaintiff last worked for defendant-employer on 8 April 1997. Plaintiff claims that she is entitled to temporary total disability benefits from that date and is further entitled to benefits under N.C. Gen. Stat. 97-29 as she is permanently and totally disabled.
7. Plaintiffs medical records were marked and received by stipulation as Stipulated Exhibit 1 (submitted at the hearing) and Stipulated Exhibit 2 (submitted on 29 January 1999).
***********
Based upon all of the competent, credible evidence of record, the undersigned makes the following additional
 FINDINGS OF FACT
1. Plaintiff, age fifty-one at the time of the hearing before the Deputy Commissioner, began working with defendant-employer on a part-time basis in November 1994. In April 1995, she began working with defendant-employer full-time as a supervisor of defendant-employers adult psychiatric unit known as the Hope Program. She supervised ten to twelve counselors and was responsible for safety on the unit, running of various programs and for assessment in the emergency room of patients with general psychological problems and substance abuse problems. She was positive and upbeat, had excellent clinical skills and performed well in her job until approximately June 1996.
2. Prior to being employed with defendant-employer, plaintiff suffered from several physical and psychological problems. In December 1989, plaintiff fell on ice and suffered a head injury, left shoulder and arm injury, neck injury and broke both jaws. As a result, she was in a body cast for a period of time, had jaw and facial surgery, and eventually had a cervical fusion in February 1993. The cervical fusion provided immediate relief, but plaintiff developed traumatic fibromyalgia. Additionally, the 1989 injury contributed to migraines and to a mood disorder, and plaintiff has been on anti-depressants on and off since the injury. Plaintiff also suffered from chronic fatigue syndrome. However, she recovered from those problems to the extent that she began functioning independently and she returned to work full-time in September 1993.
3. On 27 June 1996, plaintiff was working for defendant-employer when she found it necessary to physically restrain a psychiatric patient who was mutilating her arms. The patient was heavy and struggling as plaintiff pulled the patients arms apart and sat down, forcing the patient to the floor. Plaintiff immediately felt pain in her neck and arms and suspected that she had re-injured her neck. After approximately two minutes in that position, a nurse came to her assistance. Plaintiff reported the incident to her supervisor, and was told she could make an appointment with Dr. Charles Shields, who had treated her for fibromyalgia in the past. Dr. Shields prescribed heat and a tens unit.
4. Plaintiff did not miss any work due to the 27 June 1996 incident.
5. After the June 1996 incident, plaintiff became progressively concerned and stressed about the operation of the psychiatric unit on which she worked. She felt that the unit was unsafe for employees and patients on her shift due to the inconsistency of the staffs interaction with patients, the staffs poor training and unprofessional performance. Although her concerns were appropriate, as testified by Dr. James B. Payton, a psychiatrist who worked on the unit, her constant complaints to her supervisor and in staff meetings became an irritation to the staff. Plaintiffs relationship with the staff deteriorated and there was a great deal of tension between plaintiff and the staff. Further, plaintiff became increasingly frustrated when she perceived that no corrective action was being taken.
6. In March 1997, plaintiff began treating with Dr. Payton, the psychiatrist who worked in her unit, with complaints of depressive feelings that were not responding to medication.
7. At work for defendant-employer during the week of 20 March 1997, it was necessary that plaintiff push a patient weighing approximately 400 pounds in a wheelchair. Plaintiff pushed and pulled the patient up and down curbs and felt pain in her neck, shoulders, arms, low back and legs after doing so. During the week that plaintiff pushed the patient in the wheelchair, plaintiff noticed the onset of pain in those areas. Plaintiff reported the pain to her supervisor.
8. Plaintiff was treated for neck, shoulder, and upper and lower low back strain by Dr. Trott and Dr. Plemmons in the employee occupational health department at defendant-employer hospital. She received physical therapy on site at the hospital until August 1997.
9. Meanwhile, plaintiff became increasingly upset by her concerns about safety issues at work. She was asked several times by her unit manager to complete paperwork indicating that the required fifteen minute room checks on patients had been done, when in fact they had not. Plaintiff initially refused to do so, but by the end of March 1997 she sometimes agreed in order to avoid confrontation with other staff members.
10. Plaintiff continued to experience pain, primarily in her low back, and was doing the prescribed physical therapy prior to her twelve hour shifts. The physical therapy sometimes made her nauseated and she would vomit at work, for which her supervisor was less than sympathetic. Plaintiff requested that Dr. Trott reduce her hours at work, which he refused to do. When plaintiff requested of her staff that someone else cover her shift so she could take a couple days off to rest, no one volunteered.
11. In March 1997, when a patient attempted to hang herself, plaintiff attributed the incident to a lack of adequate supervision by the staff. As a result, plaintiff resigned, citing safety issues as her reason. Plaintiff gave six weeks notice, but her unit manager said that only two weeks was necessary and took plaintiff off the calendar. The unit manager further told plaintiff that she would do her best to insure that plaintiff did not find other work in the Asheville area. Plaintiff attempted to find other work, but was unable to do so.
12. Plaintiff last worked for defendant-employer or for any employer on 8 April 1997.
13. Plaintiff continued to treat with psychiatrist Dr. Payton, and on 3 July 1997 began to see Dr. Todd B. Guthrie, an orthopedic surgeon. Plaintiff reported to Dr. Guthrie complaints of low back pain and left leg pain greater than right leg pain which developed as she pushed a patient in a wheelchair at work. Plaintiff reported that she suffered from chronic fatigue syndrome, fibromyalgia and migraine headaches. She also reported her history of neck, spine and pelvis injuries and the injuries resulting from her 1989 accident. Dr. Guthrie assessed a sacroiliac strain or probable sacroiliac joint dysfunction and recommended use of a sacroiliac belt and pool therapy. He also recommended an MRI. The pool therapy and the MRI were denied by defendant-carrier. He last saw plaintiff on 14 August 1997 without the benefit of the MRI, but he continued to recommend pool therapy.
14. Upon recommendation of Dr. Guthrie, plaintiff was seen by Dr. Ralph C. Loomis, a neurosurgeon, on 17 November 1997. Upon Dr. Loomis instructions, an MRI was performed of plaintiffs lumbar spine. The MRI showed minimal degenerative changes in the facet joints at both L4-L5 and L5-S1 with mild bulges of the disk. Dr. Loomis recommended conservative treatment.
15. Based upon Dr. Guthries testimony, the Full Commission finds that plaintiffs incident of pushing the patient in the wheelchair during the week of 20 March 1997 more likely than not exacerbated a pre-existing arthritic condition which resulted in some sacroiliac joint dysfunction on the left greater than the right. As of July 1997, plaintiffs back condition would not have prevented her from working with some restrictions.
16. As of the date of the hearing before the Deputy Commissioner, Dr. Payton continued to treat plaintiff for a severe mood disorder and post-traumatic stress disorder originally related to her 1989 head injury. A combination of the pain plaintiff was experiencing from her 27 June 1996 incident at work and the incident the week of 20 March 1997, along with the emotional stress she was experiencing from her interaction with the staff and supervisors at work, led to a worsening of her mood disorder and an intensification of her anxiety symptoms related to her post-traumatic stress disorder. Either or both of the work-related incidents were significant contributing factors in plaintiffs psychiatric or psychological condition for which Dr. Payton was treating her. The chronic experience of pain, or the recurrence of pain on a frequent basis for a number of months, exacerbated or brought on her mood disorder symptoms. Further, the chronic pain caused her to recall past pain, which increased her anxiety symptoms, mood disorder symptoms and the post-traumatic stress disorder symptoms. By May 1997, her psychological condition had deteriorated to the point that she could not tolerate normal life stresses and became incapable of earning wages with defendant-employer or in any employment.
17. As of the date of Dr. Paytons deposition in February 1999, plaintiff continued to be incapable of earning wages. Dr. Payton testified that plaintiffs condition is permanent and that she is permanently and totally disabled. However, in his letter of 3 September 1998, Dr. Payton indicated that plaintiff was getting temporary relief from her mood instability with medications and cognitive therapy, but her pain destabilizes her moods and increases her post-traumatic stress disorder symptoms. Yet, plaintiff has not received the recommended treatment for her back condition that continues to cause her pain.
18. There is insufficient evidence from which to find that plaintiff has reached maximum medical improvement with regard to either her back injury or her psychological condition.
***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On 27 June 1996, plaintiff sustained an injury as a result of a specific traumatic incident of her assigned work with defendant-employer. N.C. Gen. Stat. 97-2(6). In addition, plaintiff was injured as a result of pushing a patient in a wheelchair during the week of 20 March 1997, a judicially cognizable period of time; her injury was not the result of a gradual onset of symptoms, but occurred contemporaneously with her duties pushing the patient during that week. Fish v. Steelcase,Inc., 116 N.C. App. 703, 449 S.E.2d 233 (1994). Thus, as a result of specific traumatic incidents of her assigned work with defendant-employer on 27 June 1996 and during the week of 20 March 1997, plaintiff sustained an injury to her back which also resulted in aggravation or exacerbation of pre-existing psychological problems. N.C. Gen. Stat. 97-2(6).
2. As a result of the specific traumatic incidents, plaintiff became temporarily and totally disabled on or about 1 May 1997, and continues to be temporarily and totally disabled. She is thus entitled to compensation at the weekly rate of $366. 67 from 1 May 1997 and continuing. N.C. Gen. Stat. 97-29.
3. Plaintiff is entitled to medical compensation necessitated by the specific traumatic incidents, including treatment for her back injury and for her resulting psychological problems. N.C. Gen. Stat. 97-25.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay temporary total disability compensation to plaintiff at the weekly rate of $366. 67 for the period from 1 May 1997 and continuing until further order of the Industrial Commission. The part of said compensation that has accrued shall be paid in a lump sum to plaintiff, subject to the attorney fee awarded below.
2. Defendants shall pay all medical compensation arising from this injury by accident, including continuing treatment as recommended by Dr. Guthrie and Dr. Payton.
3. An attorney fee in the amount of 25% of the amount due under this Opinion and Award is approved for plaintiffs attorney, said amount to be deducted from the accrued amount due to plaintiff and paid directly to said attorney by defendants, and thereafter, every fourth compensation check due to plaintiff shall be paid directly to plaintiffs attorney.
4. Defendants shall pay the costs.
***********
This the ___ day of July, 2000.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_______________ DIANNE C. SELLERS COMMISSIONER
S/_____________ THOMAS J. BOLCH COMMISSIONER